IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOHNNY LEE CUMMINGS          §
                            §
VS.                         §        CIVIL ACTION 4:05-CV-698-Y
                            §
CITY OF FORT WORTH, TEXAS    §

ORDER PARTIALLY GRANTING AND
PARTIALLY DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiff Johnny Lee Cummings has brought suit against the City
of Fort Worth ("the City") for discrimination and retaliation under
the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*
("ADA"). Cummings was a seventeen-year veteran of the Fort Worth
Police Department before accepting disability retirement after severely
injuring his back in the line of duty. After fully recuperating,
receiving a full release from his doctor to return to work as a police
sergeant, and proving that he was fully capable of performing all
of the duties required of a police sergeant, Cummings contends that
the City's chief of police refused to reinstate him because he regarded
Cummings as being disabled and because Cummings had a record of being
disabled. Cummings also contends that the City retaliated against
him because he opposed the discrimination and filed a complaint.[1]

The City has filed a motion (doc. #56) for summary judgment on
all of Cummings's claims. After review, the Court concludes that
the City's motion should be PARTIALLY GRANTED AND PARTIALLY DENIED.

---

[1] Cummings also alleged that the City discriminated against him when it
refused to allow him to sit for promotional exams because he, at the time, was
on a light-duty status. Cummings, however, has conceded to the dismissal of this
basis for the City's liability under the ADA. (Pl.'s Resp. at 12, n.5.)
Therefore, the Court dismisses that basis for liability under the ADA.

I.   Factual Background[2]

Cummings was a seventeen-year veteran police sergeant for the City until he took disability retirement in October 1993.  While in the line of duty, Cummings suffered a severe back injury from a motorcycle accident that required him to have back surgery.  His doctors opined that Cummings was "totally incapacitated for life." (Pl.'s App. at 292-93.)  According to his doctors, Cummings suffered from numerous physical limitations, and it is undisputed that these limitations prevented Cummings from fully performing the duties of a police sergeant.  He was placed on a light-duty status until his disability retirement.

Cummings claims that his decision to seek disability retirement stems from a conversation he had with then Police Chief Thomas Windham[3] and Executive Deputy Chief David Dees.  Cummings claims that Chief Windham told him that he had been an excellent police officer and sergeant for him and that Chief Windham knew Cummings desired to return to full duty.  Cummings claims that Chief Windham acknowledged that he had been undergoing a tremendous amount of therapy but that the therapy was time consuming and made it difficult for Cummings to continue to work on a light-duty status and focus on his rehabilitation.  Cummings states that Chief Windham advised him that it would

_____

[2] Because the City has moved for summary judgment, the Court will view the facts and draw all reasonable inferences in light most favorable to Cummings.

[3]  Chief Windham left the City in August 1999 and past away in January 2000.

2

be in his best interests to seek disability retirement so that he could devote all of his time to rehabilitating his back. Cummings claims that Chief Windham told him that he could return to the force if and as soon as he fully recuperated.

After accepting disability retirement, Cummings's physicians continued to advise the retirement board that Cummings was "totally incapacitated for life," that Cummings suffered from orthopedic problems and degenerative disk disease, and that he continued to suffer from physical limitations that prevented him from fully performing the functions of a police sergeant. (Pl.'s App. at 292-93.) Although Cummings was approved for disability retirement, the board permitted Cummings to work for the Fort Worth police department on a part-time basis as a coordinator for the department's Citizens on Patrol program and neighborhood watch groups (hereinafter "COPS coordinator").

Cummings began a rigorous rehabilitation program that included spending four to seven hours almost daily in physical therapy. Cummings states that his physician, Doctor Joseph Gaines, told him that if he continued this intensive rehabilitation, he might recuperate and be able to return to full duty. Doctor Gaines remarked that Cummings had "a strong desire to recover to normal physical abilities and return to work." (*Id.* at 294.)

Cummings claims that in early 1999 Chief Windham told him that if the retirement board's doctor released him to return to full duty as a police sergeant and if his disability retirement was discontinued,

he would rehire Cummings as a police sergeant.  Cummings claims that
Chief Windham told him that he would first have to get his disability
retirement discontinued and then they could start the reinstatement
process.

Cummings's determination and efforts at his rehabilitation paid
off.  In March 1999, Dr. Gaines declared that Cummings had "re-
habilitated from all injuries." (*Id.*)  Doctor Gaines reviewed the
job description for a Fort Worth police sergeant and concluded that
Cummings "can physically accomplish all tasks and return to work at
full duty status." (*Id.*)  Doctor Gaines credits Cummings's "very
positive attitude and desire to return to work" as a primary factor
in his rehabilitation.  (*Id.*)

As part of the reinstatement process, Cummings underwent a
functional-capacity evaluation administered by a doctor selected by
the retirement board.  The purpose of the evaluation was to determine
Cummings's functional abilities in light of the job description for
police sergeant provided by Chief Windham.  The evaluation required
Cummings to complete rigorous endurance tests and included requiring
him to lift 100 pounds and carrying 200 pounds for ten feet.  Cummings
completed all of the required tasks.  The board's physician concluded
that Cummings could "return to his job without modifications and
restrictions." (*Id.* at 299.)  Based on the results and the physician's
recommendation, the retirement board concluded that Cummings was no
longer disabled and it discontinued his disability retirement in May

1999.[4]

Shortly thereafter, Cummings met with Chief Windham to discuss being reinstated as a police sergeant. According to Cummings, Chief Windham told him that he would not reinstate Cummings because he thought Cummings was still disabled and would remain permanently disabled. Cummings claims that Chief Windham accused him of unduly influencing the doctor because of his desire to return to work. He claims that Chief Windham did not believe the doctor's opinion that he was no longer disabled and capable of performing all of the duties of police sergeant without restriction or modification.[5]

Thereafter, Cummings spoke with Marshal Jim Rutledge to inquire about applying for a deputy marshal position in the City's Marshal's Office. Because he was no longer on disability retirement, Cummings had no income, and he wanted to stay in the City's retirement system until he was able to get his job back as a Fort Worth police officer.

Marshal Rutledge was a retired Fort Worth police lieutenant and, thus, had been acquainted with Cummings. According to Cummings, Marshal Rutledge told him that he thought Cummings was a very professional officer and would like to have Cummings work for him. He reviewed Cummings's functional-capacity evaluation and commented

---

[4] Although the retirement board took Cummings off of disability retirement, it had no authority to reinstate him as a police officer. That decision was Chief Windham's.

[5] While the City does not admit that Chief Windham actually made these statements, for purposes of its summary-judgment motion, the City accepts Cummings's assertions as true. (Def.'s Br. at 4, n.1.)

that Cummings was in better physical condition than anyone that was currently working for him. Cummings states that Marshal Rutledge then inquired as to why he was not seeking reinstatement with the police department. Cummings states that he explained Chief Windham's refusal to rehire him because he regarded him as being disabled and that he had planned to lodge a formal complaint for discrimination.

After speaking with Marshal Rutledge, Cummings met with the City's ADA coordinator, Libby Lanzara, and explained to her his desire to remain employed with the City. According to Cummings, Lanzara reviewed his credentials and told him that the only positions he qualified for were police officer or deputy marshal. Cummings claims that Lanzara informed him that the City's Marshal's Office had openings for deputy marshal. Based on his conversation with Lanzara and his seemingly positive conversation with Marshal Rutledge, Cummings submitted an application for a deputy-marshal position.

Cummings had an initial interview with Marshal Rutledge and Chief Deputy City Marshal Ron Babcock. During this initial interview, Cummings claims that Marshals Rutledge and Babcock inquired as to why Cummings was not being reinstated in the police force. Cummings claims that he explained Chief Windham's refusal to rehire him because he believed Cummings was disabled, told them that he felt Chief Windham was unlawfully discriminating against him, and told them that he had planned to file a complaint.

Cummings claims that both Rutledge and Babcock were very

complimentary to him in the interview.  Cummings claims that they both told him that he had an excellent record and that he was superior to any other candidate for the position.  (Pl.'s App. at 69.)  At the conclusion of the interview, Cummings claims that Marshal Rutlegde walked him to the door, shook his hand, and told him that he looked forward to having Cummings work for him.  Marshal Rutledge, however, did not offer Cummings the job at that point.

Elsa Paniagua was the director of the Municipal Court Department when Cummings had applied for the deputy-marshal position.  Marshal Rutledge reported directly to her.  According to Director Paniagua, in May 1999, the Municipal Court Department began accepting applications to fill a deputy-marshal position.  A panel that included Marshals Rutlegde and Babcock reviewed the applications and conducted initial interviews.  Director Paniagua explained that the panel recommended two candidates for the position: Cummings and Mickey Kimbrow.

Marshal Rutledge and Director Paniagua interviewed Cummings and Kimbrow.  During his interview, Cummings claims that Paniagua questioned him about why Chief Windham refused to rehire him.  Cummings states that he explained just as before that he thought Chief Windham was discriminating against him because he regarded Cummings as being disabled and that he had planned on filing a complaint.[6]  Cummings

---

[6]  For purposes of its summary-judgment motion, the City concedes that Cummings did in fact discuss his alleged disability-discrimination claim against Chief Windham with Director Paniagua and Marshal Rutledge in his interview. (Def.'s Br. at 5 n.2.)

claims that after the interview concluded, Marshal Rutledge again walked him out and told him that he was the most outstanding candidate they had, that there won't be a problem, and that he would get back to him.

After a couple of weeks, Cummings learned that he had not been selected for the deputy-marshal position. Director Paniagua claims that she made the final decision to hire Kimbrow. She explained,

> Mickey Kimbrow was chosen for the position because he made a better impression during the interview, and had more traits that I was looking for in a deputy marshal. I believed that Mr. Kimbrow was better suited for the position because he had the experience for the position and he had a more positive personal disposition than Mr. Cummings. Mr. Kimbrow was more outgoing and personally engaging than Mr. Cummings . . . . I hired Mr. Kimbrow based entirely on his qualifications and his superior job interview.

(Def.'s App. at 40-41.) Marshal Rutledge is no longer employed with the City and there is no evidence as to which candidate he recommended Director Paniagua choose.

Cummings filed a sworn affidavit for discrimination with the Equal Employment Opportunity Commission ("EEOC") through the Fort Worth Commission on Human Rights in June 1999. In the affidavit, Cummings complained that the City unlawfully discriminated against him when Chief Windham refused to reinstate him as a police sergeant because he regarded Cummings as being disabled. In September 1999, Cummings filed a complaint of discrimination with the EEOC. In that complaint, Cummings alleged the City discriminated against him when

Chief Windham refused to rehire him as a police sergeant because he had a record of being disabled and because he regarded Cummings as being disabled. Cummings also alleged that the City retaliated against him for opposing Chief Windham's alleged disability-discrimination when it failed to select him for the deputy-marshal position. Shortly after filing the EEOC complaint, Cummings was fired from his part-time position as COPS coordinator. Cummings, however, never filed an EEOC complaint for retaliatory discharge.

After a thorough investigation, the EEOC determined that there was "reasonable cause to believe that there is a violation of [the ADA]." (Pl.'s App. at 1.) The EEOC went on to state,

> Further, in a like and related matter, the investigation revealed that [the City] is discriminating against a class of employees who were perceived as being disabled and/or as having a record of disability. [The City] treated them differently by requiring them to meet a physical standard not required of officers that were not perceived as having a disability and/or as having a record of a disability.

(*Id.*) The evidence revealed that in August 2000, Chief of Police Ralph Mendoza[7] began tracking all officers in the department who were on a leave of absence, sick leave, or a light-duty status due to an on- or off-the-job injury. An internal memo listed numerous officers who had been documented as having a permanent impairment preventing them from performing the full duties of a police officer. For those

---

[7] Mendoza succeeded Windham as chief of police after Windham had passed away.

officers, it was recommended that the police department begin "layoff proceedings . . . giving the officer 60 days to research other opportunities with the city or apply for disability retirement." (Pl.'s App. at 303.)

Subsequently, Chief Mendoza sent a memo to "all Fort Worth Police Department Sworn Personnel" informing them that "the department is currently evaluating all officers on injury leave or assigned to light duty positions." (*Id.* at 309.) The purpose of the evaluation was to determine whether each officer had "reached maximum medical improvement" but were still "unable to perform the essential functions of the police officer job." (*Id.* at 309-10.) Such an officer would "be advised of [his] retirement options." (*Id.*) Chief Mendoza informed his officers that "the department will not normally consider light duty details to officers until the exhaustion of the officers' entitlements . . . and then, only in those cases where it is in the department's best interests to do so." (*Id.* at 310.) Thus, according to the policy outlined in the memo, any officer who had been injured but failed to recuperate so that he could fully perform the duties of a police officer without restriction or modification would be required to leave the force.

Cummings is currently employed by the City of Weatherford, Texas, in the Weatherford Police Department as a motorcycle patrol officer. He has been so employed since November 1999.

II.  Analysis

A.    Summary-Judgment Standard

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001).  Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990).  Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).  Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins,*

*Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence, make credibility determinations or determine the truth of the matter; rather, the Court is to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and produce evidence that sets forth specific facts showing there is a genuine issue for trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

B.  Discussion

  1.  Whether the City is Entitled to Summary Judgment on
      Cummings's Claim of Disability Discrimination Based
      on Cummings's Having a Record of Disability and Being
      Regarded as Disabled

The ADA makes it unlawful for an employer to

  discriminate against a qualified individual with
  a disability because of the disability of such
  individual in regard to job application proce-
  dures, the hiring, advancement, or discharge of
  employees, employee compensation, job training,
  and other terms, conditions, and privileges of
  employment.

42 U.S.C. § 12112(a).  To establish a claim of disability discrimi-

nation, Cummings must prove three elements: "(1) At the time he sought

employment he had a 'disability' within the meaning of the ADA; (2)

he was qualified for the position for which he sought employment;

and (3) he was not hired because of his disability."  *Rodriguez v.*

*Conagra Grocery Products Co.*, 436 F.3d 468, 474 (5th Cir. 2006).

  "As a threshold requirement in an ADA claim, the plaintiff must,

of course, establish that he has a disability."  *Waldrip v. General*

*Electric Co.*, 325 F.3d 652, 654 (5th Cir. 2003)(internal quotations

and citations omitted).  The ADA defines "disability" as either "(A)

a physical or mental impairment that substantially limits one or more

of the major life activities . . .; (B) a record of such an impairment;

or, (C) being regarded as having such an impairment."  42 U.S.C. §

12102(2).  Cummings admits that at the time he sought to reclaim his

former position as police sergeant, he was not in fact disabled.

Cummings bases his claim of disability discrimination on the fact

that he had a record of being disabled and that he was regarded as being disabled.

### i.    Record of Disability

In his response to the City's summary-judgment motion, Cummings asserts that the City failed to argue that he was not disabled under the ADA based on a record of disability.  (Pl.'s Resp. Br. at 14, n.6.)  Thus, Cummings argues that the City has conceded that he was disabled as defined by the ADA based on his having a record of disability.   Alternatively, he argues that, at the very least, a genuine issue of material fact exists as to whether he had a record of being disabled.

In its reply, the City argues that Cummings never pled "record of disability" as a basis for disability discrimination.  The City contends that Cummings specifically pled two protected categories under the ADA: that he was disabled and he was regarded as being disabled.  The City contends that Cummings was "silent on the 'record of impairment'" and, thus, the City "was not on notice that it was necessary to prepare a defense for it." (Def.'s Reply at 6-7.)  Thus, the City argues, the question of whether the City discriminated against him on the ground that Cummings had a record of disability is not properly before the Court.  (Def.'s Reply at 5.)

"A claim [that] is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not

properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). In *Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002), the Supreme Court rejected any "heightened pleading standard in employment-discrimination cases," and reiterated that Federal Rule of Civil Procedure 8(a)(2) only requires a short and plain statement of the claim showing that the pleader is entitled to relief. "Such a statement," the Supreme Court stated, "must simply give the defendant fair notice of what the plaintiff's claim is **and the grounds upon which it rests**." *Id.* (internal quotations and citations omitted)(emphasis added).

In his second amended complaint, Cummings alleged that he "is disabled and/or is regarded as disabled, as defined by the [ADA] . . . ." (Pl.'s 2nd Am. Compl. at 6.) He alleged that he had "suffered an extensive permanent injury to his back and back failure [that] significantly limited his ability to work or run." (*Id.*) As a result of this injury, Cummings alleged that the City "regarded [him] as disabled." (*Id.*) Cummings went on to accuse the City of violating "the ADA by intentionally discriminating against [him] because of his disability and/or because he is regarded as disabled." (*Id.*) And under a section in his second amended complaint titled *Exhaustion of Administrative Procedures*, Cummings stated that "after a thorough investigation, the EEOC . . . determined there was reasonable cause to conclude that [the City] discriminated against [Cummings] because he was disabled and because he was regarded as disabled." (*Id.* at

15

3.)

Cummings's original and first amended complaints contain substantially similar allegations.  But what is important to note is that none of Cummings's complaints assert discrimination based on a record of disability.  Moreover, in the parties' joint status report (doc. #15), Cummings contended that the City discriminated against him "for being disabled or being regarded as disabled in violation of the [ADA] . . . ."  And in the parties' joint pretrial order (doc. #70), Cummings simply claims that "the City refused to rehire him as a police sergeant in violation of the ADA . . . ."[8]  Thus, up until his response to the City's summary-judgment motion, there was no indication that Cummings ever intended to assert that the City discriminated against him on the basis that he had a record of being disabled.

Cummings filed this suit after filing his administrative complaint with the EEOC and receiving his right-to-sue letter.  Although Cummings did assert in his EEOC complaint that the City had discriminated against him on the basis that he had a record of disability and/or that it had regarded him as being disabled, he specifically pled before this Court that he suffered from disability discrimination because he was actually disabled and/or because he was regarded as being disabled.  While Cummings's EEOC complaint gave the City notice that

_____

[8] The parties did state that the question of whether Cummings had a record of a disability is a contested issue of law.  (Joint Pretrial Order at 9.)  This order, however, was entered after the parties had filed their respective briefs regarding the City's summary-judgment motion.

Cummings was claiming disability discrimination based ON being regarded as having a disability and having a record of a disability, that notice extended to the City only while defending against those claims before the EEOC. When Cummings filed his suit in federal court specifically alleging "disability" and "regarded as disabled," the City was on notice that Cummings was asserting those grounds as bases for its liability. Based on the specificity of both the EEOC compliant and his complaints in federal court, it would be reasonable to conclude that Cummings had abandoned the "record of disability" theory alleged in his EEOC complaint.

The record shows that the City did not prepare to defend a claim of disability discrimination based on a record of Cummings's being disabled. The focus of Cummings's two depositions was on whether he was in fact disabled at the time he sought to be rehired as a police sergeant and on whether Chief Windham refused to rehire him because he regarded Cummings as being disabled. Cummings conceded in his deposition that at the time he sought to be reinstated on the police force, he was not in fact disabled. His complaint was that Chief Windham, nevertheless, refused to rehire him because he regarded Cummings as being disabled.

The City was not on notice that it should prepare a defense against record of disability as a theory of liability. Instead, the City prepared its defense based on Cummings's actual articulated theories of liability on his complaint: actual disability and regarded

as being disabled. Therefore, the Court declines to consider Cummings's claim of disability discrimination on the theory of "record of disability" because he did not plead it. Instead, he improperly raised it for the first time in his response to the City's summary-judgment motion. *See Ellis v. Crawford,* No. 3:03-CV-2416-D, 2007 U.S. Dist. LEXIS 41120 *35 (N.D.Tex. Jun. 6, 2007)(Fitzwater, J.)(in section 1983 claim involving racial discrimination, declining to entertain racially-hostile-working-environment claim raised for first time in summary-judgment response).

### ii. Regarded as Disabled

Cummings argues that the City discriminated against him because it believed that Cummings suffered from an impairment that substantially limited his major life activity of working. (Pl.'s Br. at 17.) In essence, Cummings's argument is that Chief Windham refused to reinstate him to any position in the police force because he regarded Cummings as suffering from a disability that prevented him from performing any job in law enforcement. (*Id.* at 19.)

One is regarded as having a disability if the individual (1) has an impairment that does not substantially limit a major life activity but the employer perceives the impairment as such; (2) has an impairment that substantially limits a major life activity only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having

an impairment that substantially limits a major life activity. *See Bridges v. City of Bossier,* 92 F.3d 329, 332 (5th Cir. 1996). The ADA does not define the terms "substantially limits" or "major life activity." But in the context of employment discrimination, Congress has tasked the EEOC with issuing regulations that address disability discrimination in the workplace. *See* 42 U.S.C. § 12116; *Price v. The National Board of Medical Examiners,* 966 F. Supp. 419, 425 (S.D.W.Va. 1997); *Bridges,* 92 F.3d at 332 (stating EEOC regulations "provide significant guidance"). "Such regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to statute." *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 844 (1984).[9] Under EEOC regulations, working is considered a major life activity. *See* 29 C.F.R. § 1630.2(i).

A person is "substantially limited" if he is "unable to perform a major life activity that the average person in the general population can perform" or he is "significantly restricted as to the condition, manner, or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). In the context of working

the term substantially limits means significantly

---

[9] Because the parties accept the EEOC regulations as reasonable and rely upon them, the Court will assume, without deciding, that the regulations are reasonable and entitled to deference under *Chevron*.

> restricted in the ability to perform either a
> class of jobs or a broad range of jobs in various
> classes as compared to the average person having
> comparable training, skills, and abilities. The
> inability to perform a single, particular job
> does not constitute a substantial limitation in
> the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). A perception that an "impairment . .

. affects only a narrow range of jobs can be regarded either as not

reaching a major life activity or as not substantially limiting one."

*Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 727 (5th Cir. 1995).

This is so even if the narrow range of jobs affected are not

numerically insignificant. *See Chandler v. City of Dallas,* 2 F.3d

1385, 1392 n.29 (5th Cir. 1993).

The City argues that Cummings has failed to present a genuine

issue of material fact that Chief Windham regarded him as being

disabled because Cummings "has no evidence that Chief Windham regarded

him as disabled in a broad class of jobs . . . ." (Def.'s Br. at

12.) The City points out that at the time Chief Windham refused to

rehire Cummings as a police sergeant, Cummings was working part-time

for the police department as the COPS coordinator. Further, the City

points out that repeatedly in his deposition, Cummings insisted that

Chief Windham "expressed doubt in [Cummings's] ability to perform

'patrol' and 'field work' . . . ." (*Id.*) The City argues that this

"is a narrow class of jobs" and that, therefore, Cummings has failed

to show that a genuine issue of material fact exists as to whether

Chief Windham regarded him as incapable of performing a broad class

or range of jobs. (*Id.*)

While it is true that Chief Windham did refuse to rehire Cummings in the specific job as a police sergeant, the Court believes that there is a genuine issue of material fact as to whether Chief Windham, his successor, Chief Mendoza, and the Fort Worth Police Department regarded Cummings and those similarly situated to Cummings as disabled and incapable of performing any job in the field of law enforcement.

Numerous courts have concluded that the general area of law enforcement constitutes a class of jobs. *See Williams v. Phila. Hous. Auth. Police Dep't.,* 380 F.3d 751, 764-65 (3rd Cir. 2004)(holding law enforcement is a class of jobs); *McKenzie v. Dovala,* 242 F.3d 967, 971-72 (10th Cir. 2001)(recognizing law enforcement as a class of jobs); *Stevens v. City of Vallejo*, No. 97-17176, 1998 U.A. App. LEXIS 29567 *4 (9th Cir. Nov. 3, 1998)("The evidence, viewed in the light most favorable to Stevens, shows only that Appellees regarded Stevens as unable to perform a single, particular job—that of regular police officer—rather than a class of jobs, such as law enforce-ment."); *Allmond v. Akal Security, Inc.,* No. 4:05-CV-96(HL), 2007 U.S. Dist. LEXIS 72713, *29 (M.D.Ga. Sep. 28, 2007)(finding genuine issue of material fact exists as to whether the defendants perceived plaintiff as having an impairment that precluded him from working in field of law enforcement); *Smaw v. Va. Dep't. of State Police,* 862 F. Supp. 1469, 1475 (E.D.Va. 1994)(recognizing field of law enforcement as a class of jobs); *Matlock v. City of Dallas,* No. 3:97-

CV-2735-D, 1999 U.S. Dist. LEXIS 17953 *11-12 (N.D.Tex. Nov. 12, 1999)(Fitzwater, J.)(plaintiff with hearing impairment employed as a police officer did not have disability that prevented him from performing a broad class of jobs in law enforcement).

Indeed, In *Tullos v. The City of Nassau Bay,* 137 Fed. Appx. 638 (5th Cir. 2005), the United States Court of Appeals for the Fifth Circuit recognized that numerous other courts have concluded that the field of law enforcement constituted a class of jobs under the ADA. Although recognizing that in *Bridges,* 92 F.3d at 335, it was held that the single job of police officer did not constitute a broad class of jobs, the Court also recognized that "we have not ruled on whether the area of law enforcement overall is a class of jobs." *Tullos,* 137 Fed. Appx. at 649. And although the court did not decide that issue in *Tullos,* the court still upheld a jury verdict for Officer Tullos concluding that the "jury could . . . have reasonably found that [the chief of police] perceived [Officer] Tullos's impairment as significantly restricting him from employment in the field of law enforcement, which has been found by other courts to constitute a class of jobs under the regulations implementing the ADA." *Id.*

The Court concludes that there is a genuine issue of material fact as to whether Chief Windham actually regarded Cummings as incapable of performing any sworn law-enforcement function because of his previous back injury. After being injured in the line of duty, Chief Windham did not try to convince Cummings to take a different

law-enforcement position in the police department but, instead, convinced him to medically retire altogether. And after establishing that he was no longer disabled, the evidence shows that Chief Windham still refused to rehire Cummings for any sworn position in the police department because he believed that Cummings was still disabled. Although Chief Windham did hire Cummings as a COPS coordinator part-time, the evidence also shows that this was not a sworn law-enforcement position. It was not a position "in the field of law enforcement," but rather, it was a civilian position that supported law enforcement.

Further, Cummings has submitted the EEOC determinations of his disability-discrimination complaint as well as the disability-discrimination complaints of plaintiffs Hopper, Noyes, Ahrend, Reese, and Weiler.[10] In those determinations, the EEOC, after conducting a thorough investigation, concluded that there was reasonable cause to believe that the City "identified [police officers] for employment action based upon [a] record of an injury, impairment, or disability." (Pl.'s App. at 312, 314.) The EEOC's investigation revealed that the City "began identifying police officers that had a record of injury, impairment, or disability" that required their reassignment to positions that did not exceed the restrictions placed on them by their physicians, and forced these police officers to medically retire

---

[10] Hopper, Noyes, Ahrend, Reese, and Weiler were all police officers in the Fort Worth Police Department who suffered injuries on the job that prevented them from performing the duties of police officer without modifications or restrictions. Similar to Cummings, these officers alleged disability discrimination against the City. They have since settled their claims with the City and they have been dismissed from this suit.

from or otherwise leave the police force if they failed to fully recuperate within a specified time period. And the investigation revealed that the injured or impaired police officers were "treated . . . differently" and required "to meet a physical standard not required of officers that were not perceived as having a disability and/or as having a record of a disability." (*Id.*)

"Under precedents of this circuit, EEOC determinations and findings of fact, although not binding on the trier of fact, are admissible as evidence in civil proceedings as probative of a claim of employment discrimination at issue in the civil proceedings." *Lindsey v. Prive Corp.*, 161 F.3d 886, 894 (5th Cir. 1998); *see also Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577, n.13 (5th Cir. 2003)(admonishing district court for ignoring EEOC determination in age-discrimination case). Although not binding on the Court, the EEOC's determinations are probative evidence that Cummings was regarded as being disabled and incapable of performing any job in the field of law enforcement.

Finally, Cummings has presented evidence that the Fort Worth Police Department had singled out other officers who had been injured in the line of duty and, as a result of their injuries, were incapable of performing the duties of police officer without any modifications or restrictions. The evidence showed that the police department adopted a policy of laying off these injured officers or forcing them to take medical retirement if they did not fully recuperate within

a specified period of time.  There is no evidence that the police department regarded them as capable of taking any other law-enforcement position in the police department.  Taken together, this evidence establishes that there is a genuine issue of material fact as to whether Cummings was regarded as being disabled and incapable of performing any position in the field of law enforcement.

2.　Whether the City Retaliated Against Cummings for Filing a Complaint for Disability Discrimination

Cummings complains that the City fired him from his part-time position as COPS coordinator and refused to hire him as a deputy marshal in retaliation for his opposing and complaining of Chief Windham's alleged disability discrimination.  The City argues that it is entitled to summary judgment on both claims.  First, the City contends that Cummings's retaliatory-discharge allegation must be dismissed because it exceeds the scope of his complaints to the EEOC and the Texas Commission on Human Rights ("TCHR").  *See Culwell v. City of Fort Worth,* 468 F.3d 868, 874 (5th Cir. 2006)(holding district court properly dismissed retaliation claims because they exceeded scope of complaint to the EEOC and TCHR).  Second, the City contends that Cummings's allegation that the City retaliated against him by failing to select him for the deputy marshal position must be dismissed because Cummings cannot not prove that "but for" his opposition to and complaint of disability discrimination, he would have been selected

for the deputy-marshal position.[11]

        i.   Whether Cummings's Allegation of Retaliatory
             Discharge is Properly Before the Court

Before bringing suit for discrimination and retaliation under the ADA, a plaintiff must first exhaust administrative remedies. *See* 42 U.S.C. § 12117 (incorporating 42 U.S.C. § 2000e-5(e)); *Manning v. Chevron Chem. Co. LLC,* 332 F.3d 874, 878 (5th Cir. 2003). "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378-79 (5th Cir. 2002). The filing of an administrative complaint with the EEOC "is a jurisdictional prerequisite to bringing suit . . . ." *Gupta v. East Texas State University,* 654 F.2d 411, 413 (5th Cir. 1981); *Culwell,* 468 F.3d at 874 ("Because complaints to these bodies [referring to EEOC and TCHR] are prerequisites to filing retaliation claims in court, the district court lacked jurisdiction and appropriately dismissed the retaliation claims."). "One of the central purposes of the employment discrimination charge is to put employers on notice of the existence and nature of the charges against them." *Manning,* 332 F.3d at 878.

Cummings does not contest that he failed to file a complaint

---

[11] The City does not argue that, because Cummings cannot establish that there is a genuine issue of material fact as to whether the City terminated him in retaliation for filing a complaint of disability discrimination, Cummings's claim of retaliatory discharge should be dismissed. Therefore, the Court will only consider whether that charge is properly before the Court.

with the EEOC and the TCHR alleging retaliatory discharge by the City. Instead, relying on *Gupta,* Cummings argues that the Court enjoys ancillary jurisdiction over his retaliation claim because it grows out of his earlier charge of discrimination and retaliation filed with the EEOC and the TCHR.

In *Gupta,* the Fifth Circuit held that "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." 654 F.2d at 414. Gupta had filed suit against East Texas State University ("ETSU") for employment discrimination based on national origin and religion. *Id.* at 412. Prior to filing suit, Gupta filed a complaint with the EEOC for discrimination. But after filing suit, ETSU informed him that his teaching contract would not be renewed. *Id.* at 413. Gupta added a charge of retaliatory discharge to his suit without filing a complaint with the EEOC. Because Gupta's retaliatory discharge action grew out of his original complaint for discrimination, it was held that the district court had ancillary jurisdiction.

The City argues that *Gupta* has been effectively overruled by the Supreme Court decision in *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101 (2002). *Morgan* is based on the statute of limitations in Title VII. Under section 2000e-5(e)(1), a plaintiff must file a charge with the EEOC either 180 or 300 days "after the

alleged unlawful employment practice occurred." At issue in *Morgan* was whether discrete discriminatory acts or discrete acts of retaliation that fell outside the statute of limitations are still viable if the untimely incidents were part of an ongoing unlawful employment practice and at least one of the incidents in the ongoing unlawful employment practice did fall with the limitations period. *Morgan,* 536 U.S. at 106-7. This was referred to as "the continuing violation doctrine." *Id.* The Supreme Court specifically referenced three versions of the continuing-violation doctrine: One version from the Ninth Circuit, one from the Seventh Circuit, and one from the Fifth Circuit.

The Supreme Court held that a plaintiff could not recover for discrete acts of discrimination or retaliation that occurred outside the 180- or 300-day limitation period. 536 U.S. at 105. "Each discrete discriminatory act," according to the Supreme Court, "starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day . . . period after the discrete discriminatory act occurred." *Id.* at 113. The Supreme Court recognized that discrete acts include "**termination**, failure to promote, denial of transfer, or **refusal to hire** . . . ." *Id.* at 114 (emphasis added). Thus, the Supreme Court abrogated the continuing-violation doctrine as a mechanism to keep discrete acts of discrimination or retaliation that occurred outside of the limitations period viable. Based on this, the City argues that the

28

Fifth Circuit's precedent in *Gupta* has been effectively overruled.

But *Gupta* was not based on the timely filing of a complaint with the EEOC, but on whether a plaintiff must still file a separate complaint for retaliation that occurred or grew out of an already existing complaint for discrimination. Thus, the decision in *Gupta* was not based on timeliness, but on whether a district court enjoys ancillary jurisdiction over acts of retaliation that occurred after a plaintiff had filed a charge of discrimination and, arguably, because a plaintiff had filed such a charge. The court of appeals found "strong practical reasons and policy justifications for" concluding that a district court enjoys ancillary jurisdiction over retaliation claims growing out of an earlier charge for discrimination. *Id.* at 414. In particular, the court of appeals noted,

> It is the nature of retaliation claims that they arise after the filing of the EEOC charge. Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case[,] a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII . . . . Intertwined with this practical reason for our holding is a strong policy justification. Eliminating this needless procedural barrier will deter employers from attempting to discourage employees from exercising their rights under Title VII.

*Id.* These practical considerations and policy justifications differ from the reasons for a statutory period. Limitations periods are designed to assure fairness to defendants by preventing a plaintiff from bringing a claim that has become stale and from sitting on his

29

rights until evidence is lost, memories have faded, and witnesses have disappeared. *See Burnett v. New York Cent. R.R. Co.,* 380 U.S. 424, 428 (1965). This is undoubtedly important in the employment-discrimination context where employers may not preserve personnel records for any significant period of time.

Although one of the purposes of requiring plaintiffs to first file their charges with the EEOC is to put employers on notice of the existence and nature of the charges against them, *Manning,* 332 F.3d at 878, that purpose is achieved once a plaintiff has filed his charge. At that point, an employer is on notice of a discrimination charge and is on notice that it may be held liable for any subsequent retaliation. Thus, the Fifth Circuit's rule in *Gutpa* is not designed to revive a stale claim, but to allow a plaintiff to pursue a claim for retaliation for filing a complaint for discrimination. Such a rule comports with the express purpose of the anti-retaliation provisions in the employment-discrimination statutes. *See* 42 U.S.C. § 12203(a)(prohibiting retaliation for opposing disability discrimination).

More persuasive is the fact that twice after the Supreme Court's decision in *Morgan* the Fifth Circuit continued to follow *Gupta.* In an unpublished decision issued four months after *Morgan,* the Fifth Circuit applied *Gupta* as good law, though it did not mention *Morgan* in its decision. *See Miller v. Southwestern Bell Telephone Co.,* 51 Fed. Appx. 928 (5th Cir. Oct. 7, 2002). Even more recently, the court

of appeals applied *Gupta* and held that a plaintiff's retaliation claims that occurred before the plaintiff filed his EEOC complaint did not fall in the *Gupta* exception. *See Eberle v. Gonzalez,* 240 Fed. Appx. 622, 628 (5th Cir. May 18, 2007). "Alternatively," the court stated, "to the extent Eberle is claiming that he was retaliated against *after* he filed his EEOC complaint in March 2004, this claim would be covered by the Gupta exception." *Id.* (emphasis in original).

Although the *Eberle* decision did not address whether *Morgan* overruled *Gupta,* the Court did cite *Morgan* in its opinion for the proposition that "failure to promote is a discrete discriminatory act" and therefore certain of Eberle's claims for the failure to promote were procedurally barred because he failed to seek EEO counseling within forty-five days of his non-promotion. *Id.* Given the fact that the Fifth Circuit has not addressed whether *Morgan* has overruled *Gupta* and the fact that the Fifth Circuit continues to treat *Gupta* as good law, the Court will continue to follow its precedent until the Fifth Circuit holds otherwise. *See also Griggs v. University Health System,* No. SA-06-CA-0384-XR, 2007 U.S. Dist. LEXIS 19277 *8 (W.D.Tex. Mar. 7, 2007)(following *Gupta* even in light of *Morgan* and citing numerous district court opinions throughout the Fifth Circuit following *Gupta* after *Morgan*).

Here it is undisputed that the City's alleged retaliatory discharge of Cummings occurred after he filed his complaint for disability discrimination with the EEOC and the TCHR. Therefore,

Cummings's retaliatory discharge claim is "covered by the Gupta exception" and the Court enjoys ancillary jurisdiction over it. *Eberle,* 240 Fed. Appx. at 628.

> ii. Whether a Genuine Issue of Material Fact Exists as to Whether the City's Refusal to Hire Cummings for the Position of Deputy Marshal was Retaliation for His Opposing Disability Discrimination

The City argues that Cummings's claim for retaliation based on the City's not selecting him for the position of deputy marshal must be dismissed because he cannot "meet the high burden" of establishing that "but for his complaint about discrimination, the City would have hired him" as a deputy marshal.  (Def.'s Br. at 15.)  Cummings, however, need not establish "but for" causation because the Court concludes that the City has failed to rebut Cummings's *prima facie* case for retaliation.

As to retaliation claims under the ADA that are based on an indirect method of proof, the Court applies the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *See Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir. 1998).  First, a plaintiff must establish a *prima facie* case of unlawful retaliation by proving that (1) he engaged in activity protected by the ADA; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action.  *Id.; Seaman v. CSPH, Inc.,* 179 F.3d 297, 301 (5th Cir. 1999).  By establishing a *prima facie* case, a plaintiff creates

a rebuttable presumption that the defendant-employer unlawfully retaliated against the plaintiff. *See Patrick v. Department of Homeland Security,* 394 F.3d 311, 315 (5th Cir. 2004).

If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant-employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action. *Sherrod,* 132 F.3d at 1122; *Seaman,* 179 F.3d at 301. If the defendant-employer advances a legitimate, nondiscriminatory reason for the adverse employment action, then the presumption of retaliation is rebutted and the plaintiff "must adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation." *Sherrod,* 132 F.3d at 1122; *Seaman,* 179 F.3d at 301; *Patrick,* 394 F.3d at 315; *Long v. Eastfield College,* 88 F.3d 300, 305 n.4 (5th Cir. 1996).

The ultimate issue of retaliation, then, requires a plaintiff "to prove that the adverse employment action would not have occurred 'but-for' the protected activity." *Sherrod,* 132 F.3d at 1122. In other words, even if a plaintiff's protected conduct is a substantial element in a defendant-employer's decision not to hire the plaintiff, no liability for unlawful retaliation arises if the plaintiff would not have been hired even in the absence of the protected conduct. *See Long,* 88 F.3d at 305 n.4. "The plaintiff must reveal a conflict in substantial evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment." *Sherrod,* 132 F.3d at

1122. Evidence is substantial if it is of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions. *Id.*

Cummings has made a *prima facie* case of retaliation. First, Cummings engaged in a protected activity when he told Marshals Rutledge and Babcock and Director Paniagua that he planned on filing a complaint for disability discrimination against Chief Windham when he interviewed with them. A plaintiff has engaged in a protected activity if he has opposed any practice made unlawful under the ADA. *See Long,* 88 F.3d at 304. Cummings made clear that he opposed Chief Windham's alleged disability discrimination and that he planned on filing a complaint. The Court also concludes that Cummings's belief that Chief Windham had discriminated against him was reasonable. *See Id.*("The opposition clause . . . requires the employee to demonstrate that [he] had at least a 'reasonable belief' that the practices [he] opposed were unlawful.")(Citation omitted).

Second, the City took adverse action against Cummings when it refused to hire him for the deputy-marshal position. And finally, Cummings established a causal link between his complaint of Chief Windham's alleged disability discrimination and the City's subsequent refusal to hire him as a deputy marshal. "The standard for establishing the 'causal link' element . . . is much less stringent" than the burden of proving "but-for" causation. *Long,* 88 F.3d at 305 n.4; *Sherrod,* 132 F.3d at 1122. A plaintiff need not show that

his protected activity was the sole factor motivating the employer's adverse employment action in order to establish the 'causal link' element of a *prima facie* case. *See Long,* 88 F.3d at 305 n.4. Instead, a plaintiff need only show that the defendant-employer's adverse employment action "was based in part on knowledge of the [plaintiff's] protected activity." *Sherrod,* 132 F.3d at 1122. Here, Cummings has established that, at the moment Marshal Rutledge and Director Paniagua decided to hire Kimbrow over him, they had knowledge of his opposition to Chief Windham's alleged disability discrimination and of Cummings's plan to file a complaint.[12] Thus, Cummings has established a rebuttable presumption that the City retaliated against him.

The burden now shifts to the City to articulate a legitimate, nondiscriminatory reason for selecting Kimbrow over Cummings. To meets its burden, the City is required to "articulate a nondiscrimina-tory reason *with 'sufficient clarity'* to afford the [plaintiff] a realistic opportunity to show that the reason is pretextual." *Patrick,* 394 F.3d at 317 (emphasis in original). While a defendant-employer may rely on subjective reasons for its personnel decisions, to rebut a plaintiff's *prima facie* case the defendant-employer "must articulate in some detail a more specific reason than its own vague and conclusional feeling about the [plaintiff]." *Id.* As endorsed by

---

[12] Although Director Paniagua denies she knew at the time she chose Kimbrow over Cummings that Cummings opposed and planned on complaining of Chief Windham's alleged disability discrimination, for purposes of its summary-judgment motion, the City has conceded that Paniagua did in fact have such knowledge. (Def.'s Br. at 16-17.)

the Fifth Circuit in *Patrick,* the Eleventh Circuit has illustrated this point:

> It might not be sufficient for a defendant-employer to say it did not hire the plaintiff-applicant simply because "I did not like his appearance" with no further explanation. However, if the defendant-employer said, "I did not like his appearance because his hair was uncombed and he had dandruff all over his shoulders," or "because he had his nose pierced," or "because his fingernails were dirty," or "because he came to the interview wearing short pants and a T-shirt," the defendant would have articulated a "clear and reasonably specific" basis for its subjective opinion——the applicant's bad (in the employer's view) appearance.

*Patrick,* 304 F.3d at 317 (quoting, *Chapman v. AI Transp.,* 229 F.3d 1012, 1034 (11th Cir. 2000)(*en banc*)).  The Court concludes that the City has not met its burden.

In an affidavit, Director Paniagua proffers the following reasons as the City's legitimate reason for selecting Kimbrow over Cummings: (1) she felt Kimbrow "made a better impression during the interview"; (2) Kimbrow "had more traits that [she] was looking for in a deputy marshal"; (3) she believed Kimbrow "was better suited for the position because he had the experience for the position and he had a more positive personal disposition"; and (4) Kimbrow "was more outgoing and personally engaging."  The Court finds these reasons vague and conclusional.

Director Paniagua does not explain how Kimbrow "made a better impression." She fails to articulate what specific "traits" Kimbrow possessed that Cummings did not and what specific traits she was

looking for in a deputy marshal.  Director Paniagua does not articulate

what specific experience Kimbrow had that Cummings did not and how

that experience made Kimbrow better qualified in her opinion.   And

she fails to explain what is meant by Kimbrow's having "a more positive

personal disposition" and Kimbrow's being "more outgoing and personally

engaging."   If Director Paniagua had explained, for instance, that

Kimbrow made a better impression because "he maintained eye contact

during the interview," or "had a firmer handshake," or "was more

articulate in his answers (and perhaps gave some examples)"; that

Kimbrow exhibited the trait of good judgment "by his answer to the

following question I had posed where Cummings did not"; that Kimbrow

"possessed the following experience that is better suited for the

deputy-marshal position than Cummings's police experience"; and that

Kimbrow seemed more outgoing because "he offered more than just

"yes/no" responses to questions," she might have provided the

sufficient detail necessary to force Cummings to establish pretext.

*See Patrick,* 394 F.3d at 317 (holding explanation that plaintiff was

"not sufficiently suited" for the position without more failed to

satisfy burden of proffering a legitimate reason for adverse employment

action).  But in the face of the City's vague and amorphous statements,

the Court concludes that the City has failed to meet its burden of

providing a legitimate, nondiscriminatory reason for not selecting

Cummings for the deputy-marshal position because "neither [the Court]

nor [Cummings] can identify the kind of evidence needed to demonstrate

that such . . . rank generalization[s] [are] or [are] not pretextual."
*Id.*  The City's reasons amount to nothing more than "content-less
and nonspecific" statements.  *Id.*

Moreover, the City's explanations do not necessarily connote
a nondiscriminatory reason.  After all, Director Paniagua's subjective
belief that Kimbrow made a better impression in the interview could
have been because Cummings had indicated that he planned on filing
a complaint for disability discrimination.  One of Kimbrow's traits
could have been that he was not regarded as being disabled or that
he would not file a complaint if he thought he had been unlawfully
discriminated against.  And she may have found Kimbrow to be better
suited because he didn't engage in a protected activity.  The City's
proffered reasons are essentially non-reasons for the purposes of
a discrimination defense.  *See Id.*

Because the City has failed to meet its burden of proffering
a legitimate, nondiscriminatory reason for its adverse employment
action against Cummings, the presumption of retaliation established
when Cummings made his *prima facie* case stands.  *See Id.* at 316.
Therefore, Cummings is not required at this juncture to adduce evidence
establishing that the City's proffered reasons are pretext and that
"but for" his complaining of Chief Windham's alleged disability
discrimination, he would have been selected for the deputy-marshal
position over Kimbrow.  Accordingly, the Court concludes that there
is a genuine issue of material fact as to whether the City unlawfully

retaliated against Cummings by selecting Kimbrow over Cummings for the deputy-marshal position because Cummings opposed Chief Windham's disability discrimination.

III. Conclusion

For the foregoing reasons, the City's summary-judgment motion is PARTIALLY GRANTED AND PARTIALLY DENIED. The City's motion is GRANTED in that Cummings's claim that the City unlawfully discriminated against him on the basis of him having a record of disability is dismissed because he failed to properly plead that basis in his complaint. In all other aspects, the City's motion is DENIED.

SIGNED January 30, 2008.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE